**RESOLUTION TRUST CORPORATION, as Conservator for United Federal Savings Association of Iowa, Des Moines, Iowa, Plaintiff,**

**Topeka Realty Partners, L.P., Plaintiff/Intervenor,**

v.

**ALHAMBRA HOLDINGS, INC., f/k/a Tri State Realty Investors, Inc., James E. Pohrer, Estate of Fran L. Pohrer, Peter S. Brune, and Mary J. Brune, Defendants.**

No. 91–4230–SAC.

United States District Court, D. Kansas.

Sept. 22, 1997.

Lauren M. Lowry, Lowry & Johnson, Valley Falls, KS, Grant M. Glenn, Patricia A. Reeder, Woner, Glenn, Reeder & Girard, Topeka, KS, for Resolution Trust Corp., as Conservator for United Fed. Sav. Ass'n of Iowa, Des Moines, Iowa.

Justin J. Johl, Shook, Hardy & Bacon L.L.P., Overland Park, KS, Michael D. Doering, Mark W. Untersee & Associates, P.C., Kansas City, MO, for James E. Pohrer, Peter S. Brune, Mary J. Brune.

Vernon L. Jarboe, Sloan, Listrom, Eisenbarth, Sloan & Glassman, Topeka, KS, for Thomas R. Petersen, Associated Commercial Brokers, Inc.

Eric C. Rajala, Overland Park, KS, Special Administrator.

Laurence M. Jarvis, Laurence M. Jarvis, Chartered, Kansas City, KS, Larry E. Benson, Kansas City, KS, for A. Margaret Erwin.

· Grant M. Glenn, Woner, Glenn, Reeder & Girard, Topeka, KS, for RTC Commercial Assets Trust 1995–NP3–3.

Winton A. Winter, Jr., Stevens & Brand, L.L.P., Lawrence, KS, for Topeka Realty Partners, L.P., David L. Johnson.

## MEMORANDUM AND ORDER

CROW, Senior District Judge.

This lengthy and complicated foreclosure action finally draws near to a close. The property at issue is essentially a strip shopping mall located in Topeka, Kansas. One large portion of the property formerly occupied by "Alco" was vacant during many of the past few years. However, one major tenant, J.M. Bauersfelds, a grocery store, has remained. Additional smaller portions of the property are rented to other tenants.

The closure of this case has been complicated by many factors and events. Alhambra Holding, Inc. filed for bankruptcy shortly before the Resolution Trust Corporation (RTC) commenced this action, and the RTC did not receive relief from the automatic stay for several months. Substantial delay was also occasioned by the need to clean up a portion of the property formerly used as a gasoline station. No one, including the RTC, was apparently willing to buy the property which included the potential of liability for environmental law violations. Eventually the court granted the RTC default judgment and the note and mortgage were foreclosed. The RTC, under its new moniker of RTC Commercial Assets Trust 1995–NP3–3 (NP3–3), purchased the property at a sheriffs sale on September 10, 1996. On March 5, 1997, NP3–3 assigned its interest in the property to Boulder Phoenician Limited Partnership, a Delaware limited partnership.

The only issues that remain in this case concern the receiver's final accounting, issues which ultimately implicates the final distribution of money collected by the receiver during the period of redemption.

### Short Summary of Case

September 26, 1991:

Resolution Trust Corporation (RTC) files complaint seeking judgment on note and foreclose on property (Dk.1).

April 30, 1992:

Court enters order appointing Associated Commercial Brokers, Inc. as receiver (Dk.12).

March 11, 1994:

Default judgment entered against Alhambra Holdings, Inc. In the judgment, the receiver is ordered to continue to collect rents and carrying on other duties. Note and mortgage are foreclosed. If judgment is not paid, property to be sold. (Dk.54).

September 9, 1994:

Judgment entered against guarantors (Dk.64). Receiver remains appointed.

January 1, 1996:

Topeka Realty Partners allowed to intervene. Judgment entered to reflect judgment entered in Douglas County. (Dk.70).

March 22, 1996:

Amended judgment vacated (Dk.72).

May 10, 1996:

Judgment amended again (Dk.75).

September 9, 1996:

The receiver appointed by this court, Associated Commercial Brokers, Inc., files a "Motion by Receiver for Leave to Make Extraordinary Repairs" (Dk.76). In that motion, the receiver indicates that the property's biggest lessee, J.M. Bauersfelds, is threatening to exercise its self-help remedies to fix the leaking roof above the space it rents. If J.M. Bauersfelds would exercise its right to self help, it would pay no rent during the period of redemption.

September 10, 1996:

RTC, now RTC Commercial Assets Trust 1995–NP3–3 purchases property at sheriffs sale with a $4,000,000 bid for the property. At that time, the RTC's judgment against Alhambra was $6,105,776.27.

October 16, 1996:

Court enters an agreed-upon order regarding the Receiver's Motion for Leave to Make extraordinary repairs to fix the leaking roof

March 1997:

J.M. Bauersfeld's makes a CAM payment in the amount of $26,682.12. Mr. Goodscents prepays April's rent. The RTC assigns its interest in the Certificate of Purchase to Boulder's Phoenician Limited Partnership. On March 10, 1997, the six month period of redemption ends.

April 11, 1997:

"Motion for Approval of Receivership Accounting and Discharge of Receiver" filed.

June 18, 1997:

The court holds a hearing to consider parties arguments and objections to the "Motion for Approval of Receivership Accounting and Discharge of Receiver." The parties dispute the amount of income earned and the expenses incurred during the period of redemption. The court sets a briefing schedule in the event the parties are unable to resolve their dispute upon mutually agreeable terms.

July 3, 1997:

The parties agree that a large portion of the moneys collected by the Receiver during the period of redemption can be distributed. Court enters agreed-upon order distributing $50,000 held by the Receiver. The parties are unable, however, to resolve all of their disputes regarding income and expenses.

## Analysis

Certain aspects of the receiver's final accounting are not subject to dispute. All parties agree with the following propositions: (1)

---

1. Actually, the parties do dispute this amount. In the last pleading filed by Alhambra Holdings, Inc., titled "Response of Alhambra Holding, Inc. to Proposed Order Approving Receivership Accounting Submitted by Boulders Phoenician Limited Partnership," the following statement appears: "The parties are in agreement that the net income, without adjustments, for the redemption period equals $93,106.04." Based upon the court's understanding of Phoenician's final pleading, Phoenician calculates the net income to be $93,760.52, or $654.48 more than the amount "agreed" to in Alhambra Holding's last pleading.

The origin of the $654.48 difference between the parties' figures is not apparent. However, the court notes that Exhibit B to the RTC's pleading titled "Exhibits in Support of Brief in Response to Memorandum of Alhambra Holdings, Inc." (Dk.93), indicates an "unknown difference"

---

During the six month period of redemption, $93,760.52 [1] in net income, without adjustments, was collected by the receiver; and (2) During the six month period of redemption, certain expenses were reasonably incurred by the receiver to preserve and maintain the property. All parties do not agree on the following propositions: (1) All net income collected during the six month period of redemption belongs to the parties holding the rights of redemption and (2) All expenses incurred during the six month period of redemption (including a portion of the expenses for repairing the roof) should be borne or shared by the parties holding the rights of redemption. As mentioned above, based upon the agreement of the parties, $50,000 has already been distributed. In light of the parties' agreement regarding the reasonableness of all of the other expenses incurred by the receiver, the court need not expressly discuss each and every expense and each and every inflow of cash. Unless otherwise noted, the court approves the all of the expenses incurred by the receiver during the period of redemption. The court also approves the receiver's final accounting except as modified by this order.

The court will now turn its attention to the disputed areas.

## Total Income During Period of Redemption

### CAM

On March 1, 1997, during the six month period of redemption, the receiver collected a CAM payment [2] in the amount of $26,682.12.

---

in the amount of $654.48. Adding the monthly amounts of net income found in Alhambra Holdings' proposed journal entry equals $93,760.52, the same amount Phoenician suggests is the net income for the property during the period of redemption. Nevertheless, the penultimate paragraph of Alhambra Holding's proposed journal entry again suggests that the net income for the property is $93,106.04.

Based upon its assessment of the materials submitted by the parties, the court has used $93,760.52 as the "undisputed" net income figure suggested by Phoenician and implicitly suggested by Alhambra Holdings.

2. The anagram "CAM" typically means "common area maintenance." In the context of this case, the phrase "CAM reimbursement" includes the amount of money paid by a tenant to the

That amount represented one year's total CAM reimbursement by J.M. Bauersfelds, the grocery store tenant at the property. Phoenician contends that the parties holding the rights of redemption are entitled at most to one half of that amount, representing six months (1/2 year) of the CAM reimbursement, an amount equal to their proportionate share of the sum.

The holders of the rights of redemption argue that the receiver utilized a cash basis method of accounting in maintaining the books for the property. Because the CAM payment was made during the redemption period, under cash accounting principles, the holders argue that the payment should be treated as income during that period, with no proration of the income as would be appropriate under an accrual accounting method.

■ The final distribution of funds derived during the period of redemption is essentially an equitable matter committed to the discretion of the court. *See United States v. Montgomery,* 268 F.Supp. 787 (D.Kan.1967) (state redemption rights do not apply to judicial foreclosures in federal courts of mortgages held by federal agencies; nevertheless, federal court still possesses the power to grant an equitable period of redemption). The determination of what is fair and equitable turns upon the court's assessment of all of the facts and circumstances of this case.

■ Having considered all of the arguments of the parties, the court concludes that its distribution of funds is not bound by the receiver's use of a cash accounting method. The CAM payment in the amount of $26,682.12 represents the amount J.M. Bauersfelds owes to the property owner for the entire year. The period of redemption was for a period of six months. The fortuity that the J.M. Bauersfelds' CAM payment was made during the period of redemption is not a means to cheat Phoenician out of its fair share—one half—of that amount. To hold otherwise would be tantamount to giving a pure windfall to the holders of the rights of redemption. Had the converse been true,

i.e., if J.M. Bauersfelds' payment had fallen one day outside the period of redemption, the court would not have permitted Phoenician to enjoy the full benefit of the payment. The holders of the rights of redemption are entitled to one-half of the CAM payment in the amount of $26,682.12, or $13,341.06.

### Mr. Goodscents' Prepaid Rent

■ Mr. Goodscents, a pasta and sandwich shop, is a tenant of the property. During the month of March, Mr. Goodscents apparently inadvertently made two rental payments in the amount of $2,040.69. When informed of the extra payment, Mr. Goodscents instructed the receiver to treat the second payment as prepayment for the month of April.

Like their argument in regard to the CAM payment, the holders of the rights of redemption contend that under a cash method of accounting they are entitled to the $2,040.69 prepayment of rent by Mr. Goodscents because it was income during the period of redemption. Phoenician contends that permitting the defendants to keep this payment would be a pure windfall. Under principles of equity, Phoenician contends that the rent prepayment should be excluded from the income earned during the period of redemption.

The court's analysis in regard to the CAM payment is equally applicable to this issue. The court's final equitable distribution is not constrained by the receiver's use of the cash accounting method. Permitting the holders of the rights of redemption to keep that rental income simply because it was deposited in the hands of the receiver during the period of redemption would be inequitable. That sum of money represents an amount that is owed to the owner of the property for rent during the month of April. Phoenician is entitled to the Mr. Goodscents' prepayment in the amount of $2,040.69 for the month of April.

### Expenses During the Period of Redemption

### Roof Repairs

On September 9, 1996, the receiver appointed by this court, Associated Commercial

landlord for the landlord's previous payment of real estate taxes and insurance premiums on

behalf of the tenant.

Brokers, Inc., filed a "Motion by Receiver for Leave to Make Extraordinary Repairs" (Dk.76). In that motion, the receiver indicated that the property's biggest lessee, J.M. Bauersfelds, was threatening to exercise its self-help remedies in its lease to fix the roof above the space it rents. The leaking roof was in such a dilapidated condition that the estimated cost of repair was several hundred thousand dollars. All of the parties agreed that the roof was in need of substantial repairs. Of course, no one was particularly enamored with footing the bill for the repairs.

None of the parties wanted J.M. Bauersfelds to exercise its right of self-help. Based upon the size of the repairs and the amount of monthly rent paid by the grocer, if J.M. Bauersfelds had exercised its right to self-help, the entire property would have earned little or no net income during the six month period of redemption. The RTC, as owner of the property, apparently wanted to be in charge of the repair of the roof.

Ultimately the parties were able to hammer out an agreed upon order in which they agreed that the funds for repairing the roof could be furnished by the RTC by way of loan or advancement, and that the loan would be secured by a judicial lien on the property. That order is dated September 19, 1996.

In pertinent part, that order stated:

The parties further agreed that the receiver should pay out of current income received by it as receiver for six months beginning with the month of September, 1996, an amount toward the satisfaction of said loan or advancement during the redemption period, equal to $3,500 per month, so long as the tenant Fleming does not exercise self help and pays the rent due for the same period. The redemption period began on the date of sale, September 10, 1996, and expires March 10, 1997. In the event the (sic) Fleming makes rental payments, but plaintiff does not loan or advance funds to the Receiver to repair the roof, the debtors shall retain the right to file a motion to have the plaintiff return to the Receiver any of the $3,500 payments which were made to the plaintiff pursuant to this order.

Since the time that order was entered, the receiver has managed the property and accounted for revenue and expenses, including repairs to the roof.

At the time the order was entered, this court and the holders of the rights of redemption were under the impression that any funds loaned or advanced by the RTC would be used to repair the roof directly above J.M. Bauersfelds. During the period of redemption, the RTC advanced $150,419 for repairs to the property. In April, after the period of redemption, the RTC advanced another $136,992. The roof above the Alco space was repaired at a cost of $146,900. Through negotiations the RTC was apparently able to assuage J.M. Bauersfelds immediate concerns about repairing the roof above the property it then leased. By making repairs to the "Alco" roof, J.M. Bauersfelds was willing to forgo exercising its right to self-help, a decision predicated upon the prospect of moving into the larger "Alco" space.

Unfortunately, at no point prior to undertaking the repairs to the roof above the "Alco" space did the RTC ever return to this court to explain how the funds it advanced were being used to repair the property or to seek approval of those expenditures. The holders of the rights of redemption contend that it would be unfair under these circumstances to require them to pay the $21,000 (6 = $3,500) contemplated by this court's September 19, 1996, order. The RTC responds, arguing that the repair of the roof above the Alco space was authorized by this court's September 19, 1996, order, and that in any event, the intended result of that order was achieved. By advancing funds to repair the roof above the Alco space, J.M. Bauersfelds paid rent during the period of redemption. Had that not been done, the net income for the entire property during the period of redemption would have been greatly reduced.

■ Contrary to the RTC's suggestion, the court did not understand that its September 19, 1996, order authorized the receiver to use the funds the RTC was to advance to repair the roof above the "Alco" space. Based upon the evidence and arguments pre-

sented during the hearing regarding the needed repairs, the court understood that the roof above J.M. Bauersfelds would be repaired. While the receiver's services have enabled the court to avoid the day to day micro-management of the property, a decision to undertake a major expenditure such as the repair of the "Alco" roof rather than the "J.M. Bauersfelds roof" was an extraordinary item that clearly should have been brought to the court for prior approval.

Notwithstanding these observations, the court agrees that it is fair and equitable to require the holders of the rights of redemption to pay the $21,000 contemplated by this court's September 19, 1996, order. The fundamental purpose of the court's September 19, 1996, order was to act ill a manner that would maximize the amount of income during the period of redemption, but at the same time require the holders of the rights of redemption to bear their fair share of the cost of the repairs to the roof. The goal of maximizing the amount of income was achieved through the repair of the "Alco" roof. Although the RTC's oversight is not to be commended, the court, in exercise of its discretion, orders the holders of the rights of redemption to pay $21,000 for the repairs to the roof, albeit that it was not the roof directly above J.M. Bauersfelds.

### Attorney's Fees Issue

Phoenician suggests that the holders of the rights of redemption should bear the cost of half of the extraordinary attorney's fees incurred by the receiver, most of which was incurred following the period of redemption. Phoenician indicates that the amount of fees incurred is approximately $4,500. These fees are apparently attributable to the receiver's efforts to wrap this matter up.

The holders of the rights of redemption challenge this request on two grounds. First, the holders of the rights of redemption argue that under no circumstance can they be held liable for attorney's fees incurred following the period of redemption. Secondly, the holders challenge the amount claimed by Phoenician, as no documents support

counsel's assertion that the reasonable fees incurred are $4,500.

The court believes that it could, in its equitable discretion, require the holders of the rights of redemption to pay their fair share of reasonable attorney's fees incurred by the receiver, even fees incurred following the period of redemption. The holders of the rights of redemption have not identified a rule that would require the purchaser of the property to automatically bear the attorney's fees associated with the receiver's efforts to "mop up" the foreclosure action and distribute funds collected during the period of redemption. Nevertheless, in this case the court, in the exercise of its discretion, concludes that the RTC (and now its assignee, Phoenician) should bear the costs of those attorney's fees. The court reaches this conclusion for several reasons. The court believes that it is fair to say that the RTC's actions in this case are at least a part of the reason that those attorney's fees have been incurred. In light of the volume of the postredemption period wrangling over income and expenses, additional attorney's fees are presumably attributable in part to the RTC's failure to seek court approval prior to repairing the roof above the Alco space. The parties and the receiver have dedicated a great deal of time to sorting out that particular issue. Moreover, because neither Phoenician nor the receiver have supplied the court with any records regarding the payment of the receiver's attorney's fees, the court cannot make a more definitive assessment of their reasonableness. Under all of the facts and circumstances of this case, the court deems it appropriate for Phoenician to absorb the entire $4,500 (or whatever amount) of attorney's fees requested.

### Final Distribution

Having resolved the factual and legal issues presented, the final remaining task for the court is to order the final distribution of the money held by the receiver. The following represents the court's calculations of those distributions in light of its previous rulings:

| | |
|---|---|
| Net Income During Period of Redemption: | $93,760.52 |

Deductions from Income:

| | |
|---|---|
| One half of CANI income | 13,341.06 [3] |
| Mr. Goodscents Prepaid Rent | 2040.69 [4] |

| | |
|---|---|
| Actual Net Income During Period of Redemption | 778.377.77 |

| | |
|---|---|
| Amount Previously Distributed to Holders: | 50,000.00 |
| Remaining Amount Held By Receiver: | 28,378,77 |

Expenses owed by holders of rights of redemption:

| | |
|---|---|
| Roof Repairs | 21,000.00 |

| | |
|---|---|
| Remaining Amount to be Distributed by Receiver to Holders of Rights of Redemption: | $7,378.77 |

Remaining Amount to Be Distributed by Receiver to Alhambra Holdings, Inc. c/o Donald E. Bucher:

$7,378.77 × 80% = $5,903.01

Remaining Amount to Be Distributed by Receiver to David L. Johnson c/o Winton A. Winter:

7,378.77 × 20% = $1,475.76

Total Amount to Be Distributed by Receiver to Boulders Phoenician Limited Partnership based upon this memorandum and order:

13,341.06 + $ 2,040.69 = $15,381.75—Reasonable Attorney's Fees Incurred by the Receiver Assessed Against Phoenician [5] = _____ (Amount to be distributed to Phoenician).

IT IS THEREFORE ORDERED that the Motion for Approval of Receivership Accounting and Discharge of Receiver (Dk.84) is granted in part and denied in part as set forth in the body of this opinion. The receiver's final accounting is approved as set forth in the body of this opinion. The receiver shall distribute funds as follows:

Remaining Amount to Be Distributed by Receiver to Alhambra Holdings, Inc. c/o Donald E. Bucher:

$5,903.01

**3.** The owner of the property, Phoenician, is entitled to the other half of the CAM payment.

**4.** The owner of the property, Phoenician, is entitled to this amount.

**5.** The court assumes that Phoenician and the receiver can resolve this dispute without further court intervention. Within ten days of the date this memorandum and order is filed, the receiver shall notify the court in writing as to whether or not this issue has been resolved upon mutually agreeable terms.

Remaining Amount to Be Distributed by Receiver to David L. Johnson c/o Winton A. Winter:

$1,475.76

IT IS FURTHER ORDERED that the receiver will not be discharged by the court until the issues raised in footnote number five are resolved in a manner approved by the court. The receiver shall make no disbursements to Phoenician from the funds received during the period of redemption until the issues raised in footnote number five are resolved in a manner approved by the court.